CASE No. 1017.

## ASHLEY v. HOLMAN.

1. If the committee of a lunatic become chargeable for profit made to himself by the labor of such lunatic, and then die, the succeeding committee may bring action against the executors of the deceased committee for an account of such profits, without joining the lunatic as a party.
2. The care of the persons and property of lunatics has always been in this state a branch of equity jurisdiction, and not a duty imposed upon the Chancellor apart from his powers as a judge of the Court of Equity.
3. An order of the Court of Equity appointing a committee for a lunatic and authorizing the committee to retain the entire annual interest of the lunatic's estate for his support and maintenance, is no bar to an action to require the committee to account for profit subsequently made to himself by the labor of his ward.
4. Although one *non compos mentis* cannot assent to a contract, yet the law raises an obligation on the part of a person benefited by the services of a lunatic to pay for such services; and upon this obligation an action may be maintained in the courts.

Before PRESSLEY, J., Barnwell, June, 1880.

Action commenced April 13th, 1880, by Joseph Ashley as committee of William Ashley, the younger, a person of unsound mind, against William A. Holman and William A. Bailey, as executors of the will of William Ashley, the elder, deceased.

G

The complaint alleged that William Ashley, the younger, was adjudged a lunatic by the Court of Equity, in October, 1854, and that in February, 1855, his father, William Ashley, the elder, was, by an order of said court, appointed committee of the lunatic's estate, which, " having been reported as of the value of $2000," derived by inheritance from his grandfather's estate, " it was provided in said order of appointment, that the annual interest thereon, or one hundred and forty dollars, be allowed said committee yearly, for the support and maintenance of said ward ;" that this estate passed into the committee's hands; and that in his returns for twenty years he charged himself with $140, received as interest, and credited himself with $140 paid for support and maintenance, but did not charge himself with any sum for the labor of his ward, which had been regularly rendered by the lunatic to his committee, and was of the full yearly value of $200 ; that the father died in 1879, and the defendants became the executors of his will ; and that in April, 1879, the plaintiff was appointed the committee of the lunatic, and had received from the defendants the $2000, the original estate, but had received nothing on account of the profits realized by the testator from his son's labor and services. Judgment was demanded for the sum of $200 a year for twenty-four years, with interest on each year's wages, as upon the investment, which should have been made thereof.

The defendants demurred, upon the ground " that the complaint does not state facts sufficient to constitute a cause of action."

This demurrer was sustained by the Circuit judge, who filed the following decree :

The action being for an account, in which title to property is not involved, the plaintiff, as committee, is a necessary party, interested in the cause of action set forth in the complaint, and entitled to sue thereon in behalf of his ward. The latter should properly have been joined as a plaintiff in the action, but any objection on that score could be taken only on the ground of defect of parties, specially assigned as cause of demurrer, and under the present issue could not be considered.

The action is not upon a contract alleged to have been made between the lunatic and defendant's testator, nor upon circum-

stances relied on as the basis of an implied contract. It is an action for an account for the value of the services of the lunatic, for which it is claimed that defendant's testator is chargeable as for money received as committee for the benefit of the ward's estate. The question whether an express contract entered into with an adjudged lunatic would be binding on either party, and if not binding, whether a contract would be implied, by law, under circumstances where an express agreement would be void, is therefore not involved in the present issue. For if the lunatic could not contract for wages, his committee could certainly contract for him, and as the committee would undoubtedly be held to account for any wages received from one with whom he had contracted, he would be equally liable to account for the value of his ward's services if he employed him in his own business.

The complaint states that the lunatic's capacity to render services as domestic servant or laborer existed at the date of the order appointing the committee and awarding maintenance. It must be assumed, therefore, that the court was duly apprised of the fact.

It is further stated in the complaint that the allowance was *to the committee* for the maintenance and support of the ward, not simply that the allowance was for maintenance and support, or to be expended therefor. It must be understood, therefore, as a provision for a fixed compensation to the committee for his care and maintenance of the ward. If the provision had been only for the allowance of a stated sum for maintenance, or to be expended for the support of the ward, the committee would be held bound to account for his disbursements of the fund, and the account would properly include any additional sums of money received by, or chargeable to, the committee for earnings of the ward.

Regarding, then, the allowance as a fixed rate of compensation to the committee, and assuming that the court was informed of the ward's capacity to labor and make earnings, it is apprehended that the court could not have contemplated or intended, that while the entire income of the estate should be retained by the committee by way of compensation, he should, nevertheless be held to account for and pay back to the estate the value of

the ward's services—worth more, according to the allegations in the complaint, than the income allowed—the result of which would be to increase the estate. It is considered that the effect of the order, as set forth in the complaint, was to allow the defendant's testator, as committee, as well the services of his ward as the income of his estate, as compensation for maintenance and support of the ward, and in the absence of any charge of fraud in procuring the order, or of other allegations affecting its integrity, the plaintiff is concluded by said 'order from claiming an account for wages. And upon this ground the demurrer must be sustained.

From this decree the plaintiff appealed, alleging error in " his Honor's conclusion of law, that the order for maintenance, as set forth in the complaint, concludes the plaintiff from claiming an account for his ward's earnings, as presented in the complaint, and hence, that said complaint does not state facts sufficient to constitute a cause of action."

*Mr. John J. Maher*, for appellant.

Whether the order of February, 1855, concludes this plaintiff, must, under a demurrer, be determined wholly by the matters stated in the complaint. 6 *S. C.* 49. This is a fair test: If the answer had set up this order in the identical language of the complaint as a bar to the action, would a demurrer by plaintiff be sustained ? There is nothing in the order to show that the court knew that the lunatic had the intelligence and physical aptitude to discharge the duties of a servant, or intended to let the committee have his ward's services as well as income. His Honor assumes that the court knew this fact, and hence his conclusion.

The proceedings under which a committee is appointed (*Rich. Eq. Cas.* 404; *Stock on Non Comp. Ment.* 85, 119, 189; *Macpherson on Inf.* 107, 216; 1 *How.* 134; 6 *Wheat.* 117; 5 *Rich. Eq.* 531,) gives no information to the court, except as contained in the master's report; but the complaint does not intimate that any such fact was brought to the attention of the court. There can be no presumption that it was, when the record, which is not in evidence because of the demurrer, would determine the matter.

The court cannot assume facts on a demurrer, as an estoppel to a plaintiff's claim, as to which its own records, if produced in evidence, would speak definitively. Particularly so, as against a lunatic, and in favor of his committee, whose duty it was then, and at all times afterwards, to bring to the attention of the court his ward's capacity to earn wages. Had this order been asserted in the answer as a defence, the record itself, and not parol testimony, would have been the proof; and the record disclosing only such facts as are stated in the complaint, the defence would have failed. Can the court assume what parol evidence would be inadmissible to prove?

His Honor may have considered that it was the duty of the court to be fully informed concerning this matter, and hence presumed that the court was informed. If the court had made order in regard to these earnings, we must presume that it acted after due investigation; but presumptions can go no further. Judicial acts are susceptible of regular proof; as to them, the maxim *omnia presumuntur rite acta* has a limited application. *Best on Presump.*, §§ 57, 68, 74; 1 *Greenl. on Ev.*, § 19; 4 *Rich. Eq.* 152; *Rice* 232; 13 *Rich. Eq.* 210; 2 *Hill's Ch.* 72; 2 *Phil. on Ev.* (*Cowen & Hill*) note 298; 12 *S. C.* 144. The order was dealing only with maintenance and provided it from an income certain, and not from an uncertain source. If there is any presumption at all, it would be that the entire interest would not have been appropriated, without abatement, if the value of the ward's services had been considered.

The distinction drawn between allowance for maintenance and allowance *to the committee,* is merely verbal, and the inference not well founded. *Stock on Non Comp. Ment.* 189, 193; *Macpherson on Inf.* 348; *Adams' Eq.* 293; *Rich. Eq. Cas.* 3. There was no special contract with the committee; he was entrusted with a trust fund, appropriated exclusively for the purpose stated.

Whatever was justly due by the committee to his ward was paid by operation of law. 2 *Strob. Eq.* 206; 6 *S. C.* 490; 7 *S. C.* 153. The lunatic was no party to the former proceedings, and, therefore, not bound by what *might have been* put in issue. Nor does the doctrine of estoppel by matter of record embrace any matter to be inferred by argument from the judgment. 1

*Smith's Lead. Cas.* ·424; 1 *Greenl. on Ev.*, § 528 ; 1 *Stark. on Ev.* 201 ; 6 *Wheat.* 109.

*Mr. Samuel W. Melton,* contra.

The decree of maintenance made, it must be assumed upon careful inquiry and consideration, is conclusive, and the matter not having been brought in question during the committee's lifetime, is *res judicata,* and moreover has been fixed by contract between William Ashley, the elder, and the Chancellor, representing the lunatic, and year by year performed and settled. The infant is a ward in chancery ; the lunatic is not. It is a personal trust in the Lord Chancellor, delegated to him under the sign-manual of the King. From his decree an appeal lies only to the King in council. The Chancellor acts not as a court, but as the trustee of his lord the King. 2 *Story's Eq. Jur.*, § 1334; 3 *Bl. Com.* 427 ; 19 *Ves.* 121, 280. In cases of infancy, the nature of the estate may not be changed ; not so in lunacy. 2 *Bligh (N. S.)* 129. Here the state is the King, and the Chancellor the agent, and that his administration has taken the form of judicial procedure is accidental.

The purpose of this peculiar jurisdiction is primarily not the preservation of the estate, but the comfort and well-being of the lunatic. With reference to the management of his person and estate, the discretion of the Chancellor is without limit or discretion. The great object in view, generally, is the interest and comfort of the lunatic, and not the interests of his heirs. 1 *Ves., Jr.,* 296, 462 ; 2 *Meriv.* 102 ; 2 *Ves., Jr.,* 72 ; 6 *Ves.* 8 ; 18 *Ves.* 285, 393 ; 14 *Ves.* 182 ; 19 *Ves.* 124 ; 1 *Ves., Jr.,* 463, note 6 ; 2 *Sch. & Lef.* 439 ; *Adams' Eq.* 297. Everything is included in the idea of maintenance—what he should have and what he should be permitted to do. It must be assumed that the whole duty incumbent upon the court was done ; and that whatever was adjudged is right, and is conclusive. *Story's Eq. Pl.* 782 ; *Herm. on Estop.*, § 37 ; 3 *P. Wms.* 104. But this action is for account. Here, there was no contract between committee and lunatic, and could have been none. The contract between the court and the committee was only for maintenance. The committee was only the agent of the court, charged with a special

and expressed duty. He is no more chargeable with an account for services rendered than would be the superintendent of the asylum who made his patient useful about the premises.

The demurrer is proper, for a committee cannot sue for a lunatic, and if he has no right to sue, then there is no cause of action to him. *Bliss' Code Pl.*, § 414; 28 *N. Y.* 242; 34 *N. Y.* 480; 3 *Hill* 338; *Rice* 56; *Code*, § 134. The committee is not the trustee of an express trust. 1 *Story's Eq. Jur.*, § 980; *Lewin on Trusts* 299, 591; *Adams' Eq.* 295; *Bliss' Code Pl.*, § 54; 8 *Rich. Eq.* 286. Nor is he a person authorized by statute to sue.

The action at law must be based upon contract. Here contract is not alleged, nor could it be, since a lunatic cannot enter into contract, and where a contract could not be expressly made none can be implied. *Pars. on Cont.* 383, 386; 2 *Kent* 450; 15 *Wall.* 9; 2 *Paige* 422; 2 *Bl. Com.* 443; 3 *Id.* 159. This is not such an action as equity would entertain—it is purely legal. 2 *Story's Eq. Jur.*, § 459.

*Mr. Robert Aldrich,* for respondents.

*Mr. J. J. Maher,* in reply.*

March 30th, 1881. The opinion of the court was delivered by

SIMPSON, C. J. William Ashley, the elder, was appointed committee, after inquisition found, of his son, William Ashley, the younger, then about twenty-five years of age, on February 13th, 1855. It is stated in the complaint that this appointment

---

* The following matter of practice was determined in this case: Mr. Maher argued only his grounds of appeal. Messrs. Melton and Aldrich, for the respondents, raised in their arguments, other points taken in the court below, to sustain the conclusions of the Circuit judge. Mr. Maher, in reply, read an argument in print, which he had not filed with the clerk of this court. Messrs. Melton and Aldrich claimed the right to submit a printed reply to the points in Mr. Maher's second argument, which had not been discussed in his opening argument; but

The Chief Justice ruled that the second argument of Mr. Maher being in reply only to the points made by the respondents, was in order; and that if he so preferred he might print such reply-argument; and that nothing further could be submitted by respondents.—REPORTER.

was made by an order of the Court of Equity; that the estate of the lunatic, as reported to the court at that time, was valued at $2000; that the order constituted the father committee both of the person and the estate of his son; and that it was provided in the order that the annual interest on the estate, or $140, should be allowed the father, as committee, for the support and maintenance of his son.

William Ashley, the father, died on February 25th, 1879. The defendants, respondents, qualified as executors óf his will, and the appellant was afterwards appointed committee of the son-

Upon settlement attempted between the respondents, as executors of the former committee and the appellant as present committee, appellant claimed an accounting for the services of the lunatic, alleged to have been rendered to the former committee. The claim was at the rate of $200 yearly, and was in addition to the capital fund of $2000.

This claim was resisted by respondents, and appellant received and receipted for the capital fund, but without prejudice to his claim for the alleged services and the interest thereon.

This action has been brought for these services, the prayer of the complaint being that an account be taken under the order of the court of the sums received, or which should have been received, by the former committee on account of the wages earned by the lunatic from February 13th, 1855, to February 22d, 1879, and of the interest accrued on each several sum received, or which should have been collected on account of each year's wages, as upon the investment made, or which should have been made thereof.

To this action the respondents demurred, " for the ground that the complaint does not state facts sufficient to constitute a cause of action." The Circuit judge sustained the demurrer, holding that the appellant was concluded by the original order by which respondent's testator was appointed committee, this order, in his judgment, when properly construed, being intended to allow the committee not only the interest on the capital fund, $140, but, also, whatever services the lunatic could render, if any, as compensation for the support and maintenance of the lunatic, which

his relation to him required the committee to furnish or see that he received it.

The appellant excepted to this ruling, and the appeal brings up the single question : " Whether the order, as stated in the complaint, precluded the claim of appellant to an account for the earnings as therein preferred."

The case has been argued before this court with great research and zeal by counsel on both sides, and we are greatly indebted to counsel for the thorough discussion given to the case in all its aspects, and for the very full preparation of the points and authorities with which they have furnished the court, so as to aid the court in reaching a proper conclusion.

There being, however, but a single question raised by the appeal, it will not be necessary to follow the argument into all of the points presented.

It is not the purpose of this court to express any opinion as to the facts; whether the lunatic, in this case, was able or did render any service of value to his committee, or whether the work he did, if any, should be regarded as the necessary and healthful discipline to which he should have been subjected as contributing to his physical comfort and health. If he was able to do steady work, even as a hireling or common laborer, sufficiently so to earn $200 per annum, it seems strange that he should require a committee to take care not only of his estate but of his person. But these are questions of fact which are not involved in this demurrer, and we propose to leave them for future investigation.

If this action was an action in behalf of the lunatic for an unsettled demand on account of wages earned by his labor, then the lunatic himself should have been party plaintiff.

In *Sims* v. *McLure*, 8 *Rich. Eq.* 286, Chancellor Wardlaw said : " The practice of instituting suits in the name of the committee only is sustained by high authority, but in this state it is certainly better to follow the general rule of pleading, to make all parties to the suit, who are materially interested in the object of it, and not to litigate and adjudge concerning the estate of any person, even a lunatic, who is not before the court."

But this is not an action strictly for the wages of the lunatic.

It is a case " in chancery," by a trustee, against the representatives of a former trustee (as it is alleged) seeking an accounting for the estate of the *cestui que trust*, which, it is alleged, the former trustee had in his hands, at his death, belonging to the *cestui que trust*. It proceeds upon the theory that the former trustee having received the benefit of the labor of his ward he thereby became debtor to himself, as trustee, for the value of this labor, and, being both debtor and creditor, under the principle of *Schnell* v. *Schröder, Bail. Eq.* 335 ; *Griffin* v. *Bonham,* 9 *Rich. Eq.* 71 ; *Jacobs* v. *Woodside,* 6 *S. C.* 498, he is presumed in law to have paid himself, and since such payments he has been holding the amounts so received as trustee, and, therefore, it is a proper subject of accounting between the present committee and his representatives.

This, in the opinion of the court, is a correct principle, and if the facts will sustain the allegations the action would not be obnoxious to objection on account of the manner in which it is brought. William Ashley, the elder, being the committee of the person as well as of the estate, he was authorized to make proper contracts in his behalf, and if the lunatic was capable of service, he, the committee, could contract as an individual, with himself as the committee, in reference to this labor, as well as he could with other persons, either expressly or impliedly. In which case he would occupy the relation, as to such matter, both of debtor and creditor, and the cases referred to above would apply.

All this is based on the idea that the committee was a trustee, and that the custody and control of lunatics is a matter of equity jurisdiction, analogous to and subject to the same rules and principles as are applied to other fiduciary relations, such as guardian and ward, trustee and *cestui que trust,* &c. Much learning was displayed in the argument upon this branch of the case, and there is no doubt but that in England lunatics and idiots occupy a different position to the courts and in the law from all other *cestuis que trust.* There is no doubt but that the Lord Chancellor, under the sign-manual of the King, was the special custodian of this unfortunate class of society there, and that committees were his agents and responsible to him. It was not a subject matter over which his court had jurisdiction, but it was a power

conferred upon the Lord Chancellor, as the representative of the crown, to be exercised as a special and personal duty. But whatever may have been or may now be the law in England on this subject, or whatever may have been its origin there, this principle has never prevailed practically in this country.

Lunatics and idiots, and the care of their persons and property, are now and have always been with us considered and acted upon as a branch of equity jurisdiction, and the Chancellor who made the original order in this case, in 1855, acted by virtue of this jurisdiction, and not by any special power conferred upon him as an individual, either from the state or any other power as a special duty. Any other Chancellor of the state could have passed the order as well as he.

But this is aside from the question presented in the appeal, *i. e.,* the effect of the original order of appointment. Is that order a bar to this action, as urged by respondents and held by the Circuit judge? The pleadings did not disclose fully the facts upon which the order was passed. It does not appear from the pleadings whether or not the condition of the lunatic (further than simply that inquisition had been found) was made known to the Chancellor, and we have no other guide as to the intent of the order than its terms. There is nothing said in it on the subject of the services and labor of the lunatic, and there is certainly no express contract contained in it permitting the committee to have the benefit of such labor as a part of the compensation to be allowed him for his care and trouble.

It is manifest, from the character of the order, that the Chancellor had no conception that any services could be rendered by the lunatic. Assuredly not that his services could be worth $200 per annum, otherwise he would not have provided so especially for his support and maintenance out of the funds in hand. He expressly set apart the interest on this fund, $140, for support and maintenance. This would have been wholly unnecessary if the lunatic had been regarded able to support himself by his own labor. And we have no idea, on the other hand, that the committee ever dreamed for a moment during his life that his estate, after his death, would be called upon to respond to a claim like this. But, although this may be true, and, also, that the court

in passing the order and the committee in accepting the trust, both acted upon the supposition that the labor of the lunatic could be of no service to any one, and was not to be regarded or provided for, yet we do not think that the order, under the circumstances of the case, amounted to a judgment, final and conclusive, upon that question, in the sense that the question has already once been adjudicated, and that that adjudication must be held as a bar to this claim, whether meritorious or not.

It is said that the lunatic could not make a contract; that, being a lunatic, he was without the power of assent, which is an essential element of all contracts. A contract is an agreement between two or more parties, each being capable of assenting to its terms; and as one devoid of reason cannot assent, of course he cannot make an express contract. But there is a large class of legal obligations, arising out of acts where both parties are silent and no positive assent given on either side, denominated in the books as implied contracts, in which parties are sued and held liable in all of the courts. True, in these cases, this has been done in part on the theory that there was a contract between the parties implied by the law. This, however, is a fiction, as in most of such cases it is well understood that there never has been that mutuality of assent which the law lays down as an essential element of any contract. This idea of an implied contract was a fiction invented by the courts, as Mr. Pomeroy, section 512, says, " in order to bring such obligations under the old action of *assumpsit*."

We find many such fictions in the history of the old pleadings, (notably in the old action of ejectment,) arising out of and made necessary on account of the stringent rules and forms of practice under the former system.

And Mr. Pomeroy further says, section 540, since the adoption of the code: " That it has been settled by an overwhelming preponderance of authority that it is no longer necessary to aver a promise in actions upon what were known at common law as implied contracts. It is enough to state the ultimate facts from which the law raises the duty or obligation to pay. The courts everywhere, where the code has been adopted, are beginning to deal more directly with the facts and substance, and dispensing

more and more with forms and shadows. And when the true ends and objects of courts are considered, this tendency towards settling controversies upon their real merits, is not to be regretted."

If, indeed, an unfortunate lunatic, bereft of his reason so far as to be unable to assent to a contract, is yet able, physically, to labor and does labor to the profit of another, can it be that he must be deprived of all compensation on the ground that he could not make a contract? and, on that account, there is no form of action suited to his case? This would be a burning reproach to any system of pleading, and a stigma upon any country where such a principle prevailed.

There is no reason why the law should not raise an obligation on the part of a recipient of a lunatic's labor to pay for it as fully as it does in cases where the parties are sane. In fact, inasmuch as sane parties can protect themselves and lunatics cannot, there is a greater reason why the law should be more watchful as to the rights of the latter than the former.

No doubt, in this case, that William Ashley, the elder, took the custody of his son without regard to his labor, and with no purpose to avail himself thereof. The unfortunate son, as it appears, was an incurable lunatic, and it was necessary that some one should take him and his estate in charge. No one was more suitable for this purpose than his father, and he was properly appointed. While it is almost an anomaly in nature to suppose that a confirmed lunatic could be able for any steady work, or be expected to perform it; and while it is not the duty of a committee to put such a ward out to labor, and while it can scarcely be believed that a father, appointed the committee of an afflicted son, with his reason gone, would make a regular domestic, menial servant of him, with the view to make profit and personal benefit out of his enforced services, yet if, in any case, where this relation exists, the facts will sustain an allegation that the committee has thus enjoyed the wages of the ward in the way of valuable services rendered, the doors of the court should not be shut upon the poor unfortunate; he and his friends should have the opportunity of a full and fair investigation of his claim, and

if the facts warrant such a result, to have it established and enforced.

The order sustaining the demurrer is reversed and the appeal sustained.    Let the case be remanded.

McIVER and McGOWAN, A. J.'s, concurred.